### THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 1:18-cr-00144-TWT-RGV |
| | : | |
| ROBERT HAROLD SIMMONS | : | |

### MAGISTRATE JUDGE'S FINAL REPORT,
### RECOMMENDATION, AND ORDER

Defendant Robert Harold Simmons ("Simmons") is charged in a three-count indictment with conspiracy and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(2), and 846. [Doc. 1].[1] Simmons has filed a motion to dismiss the indictment due to inexcusable pre-indictment delay, [Doc. 20], and a motion to suppress statements, [Doc. 21], both of which the government opposes, [Docs. 26 & 53].[2] Following an evidentiary hearing on his motion to suppress statements held on June 5 and June 18, 2019,[3] the parties filed post-hearing briefs, [Docs. 52, 53, & 54]. For the reasons that

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Simmons filed a reply in support of his motion to dismiss. See [Doc. 29].

[3] See [Docs. 48 & 49] for the transcripts of the evidentiary hearing, which will be referred to hereinafter as "(Tr. at ___)." The government also submitted exhibits at the hearings, which will be referred to as "(Gov. Ex. ___)."

follow, it is **RECOMMENDED** that the pending motions, [Docs. 20 & 21], be **DENIED**.

## I.  INTRODUCTION

On April 24, 2018, a federal grand jury in the Northern District of Georgia returned a three-count indictment against Simmons.  [Doc. 1].  Count One of the indictment charges that between "in or about February 2012, and continuing through in or about July 2015," Simmons conspired to "obtain[] prescriptions from Atlanta area pain clinics for oxycodone, methadone, and alprazolam, among other drugs, for the purpose of selling the pills," which he accomplished by "personally obtain[ing] prescriptions" and, "[a]fter obtaining the prescriptions and buying additional pills from patients," he "would sell oxycodone, methadone, and alprazolam pills in bulk to a drug trafficker for the purpose of further distribution of the controlled substances."  [Id. at ¶¶ 1, 3-4].  Counts Two and Three charge Simmons with "knowingly and intentionally possess[ing] with the intent to distribute a controlled substance," consisting of "168 tablets [of] oxycodone 30mg, 120 tablets [of] methadone 10mg, [and] 30 tablets [of] alprazolam 2mg" on April 30, 2013, and May 29, 2013.  [Id. ¶ 6].  Simmons has filed two pretrial motions, [Docs. 20 & 21], which are now fully briefed and ripe for ruling.

## II.  DISCUSSION

**A.**    **Motion to Dismiss the Indictment Due to Pre-Indictment Delay, [Doc. 20]**

Simmons moves to dismiss the indictment due to an alleged violation of his Constitutional speedy trial rights and inexcusable delay of nearly three years between the date of the last charged conduct and the return of the indictment, arguing that he "has sustained prejudice as the lapse of time has impaired his ability to marshal a sufficient defense, particularly considering that much of the most inculpatory evidence is derived from statements of others made three [] years ago or longer."  [Doc. 20 at 1-2].  He adds that "[w]ith the lapse of time, memories as to the parties and witnesses have been considerably diminished" and "[a]ccess to individuals who can assist in his defense . . . is likewise much diminished."  [Id. at 2].  Simmons alleges that the delay constituted an intentional effort by the government "to acquire the cooperation [of] alleged co-conspirators and other putative witnesses through an immunity agreement that took time because of the need to secure those co-conspirators' and witnesses['] access and cooperation."  [Id. at 2-3].

In response, the government asserts that the indictment was brought within the applicable five-year statute of limitations and argues that Simmons failed to "put forth any evidence showing that the [g]overnment obtained a tactical advantage by indicting in April 2018 rather than immediately after the conspiracy

concluded in July 2015." [Doc. 26 at 3-4].  The government adds that no immunity agreements were reached in this case.   [Id. at 4].   Moreover, the government maintains that Simmons cannot show any actual prejudice due to the delay.  [Id. at 5-6].

The general statute of limitations for non-capital federal offenses such as those charged in this case is five years.   See 18 U.S.C. § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed.").   "The statute of limitations is the primary safeguard against the government bringing stale criminal charges, but when a defendant establishes substantial prejudice, due process may require the dismissal of an otherwise timely indictment if the delay was the product of a deliberate act by the government to gain a tactical advantage."  United States v. Ramirez, 491 F. App'x 65, 70 (11th Cir. 2012) (per curiam) (unpublished) (internal citations omitted).  That is, to prevail on a due process violation claim, Simmons "must show that pre-indictment delay (1) caused actual prejudice to the conduct of his defense, *and* (2) was the product of deliberate action by the government designed to gain a tactical advantage." United States v. Jones, 592 F. App'x 920, 921-22 (11th Cir. 2015) (per curiam)

(unpublished) (emphasis added) (citation omitted).[4]  "Because [Simmons] does not argue that the applicable statute[] of limitations barred his prosecution, he shoulders the burden of show[ing] that pre-indictment delay was deliberate for the purpose of tactical advantage."  Ramirez, 491 F. App'x at 70 (last alteration in original) (citation and internal marks omitted).  "The burden of satisfying the 'tactical advantage' test rests with [Simmons], and that burden has been characterized as a 'heavy' one."[5]  United States v. Stoll, No. 10–60194–CR, 2011 WL 939251, at *7 (S.D. Fla. Feb. 16, 2011), adopted by 2011 WL 765949, at *1 (S.D. Fla. Feb. 25, 2011) (citation omitted).  "Indeed, so 'rare' are dismissals for pre-indictment delay that [the Eleventh Circuit] once remarked that it had 'never

---

[4] "[T]he law in this circuit is that prejudice will not be presumed because of a lengthy delay," United States v. Williams, Criminal Case Nos. 1:11–CR–547–ODE–ECS, 1:12–CR–80–ODE–ECS, 2012 WL 5845004, at *1 (N.D. Ga. Nov. 16, 2012) (citations and internal marks omitted), and, with respect to the second prong, "simply gaining a tactical advantage is not enough" as the "tactical advantage must be the result of deliberate action by the government toward that end," Jones, 592 F. App'x at 922 (citation omitted).  "Both prongs of [the] test must be satisfied to make relief available to a defendant[.]"  United States v. Hawes, No. 5:14–CR–397–RDP–TMP, 2015 WL 4067331, at *2 (N.D. Ala. July 1, 2015) (citation omitted).

[5] Moreover, "the Eleventh Circuit . . . determined that addressing the prejudice prong was not necessary if the defendant failed to carry his burden with respect to the deliberate-delay prong."  United States v. Baez-Hernandez, No. 8:14–CR–64–T–17TGW, 2014 WL 2612066, at *2 (M.D. Fla. June 11, 2014), aff'd, 653 F. App'x 895 (11th Cir. 2016) (per curiam) (unpublished) (citation omitted).

concluded that such a dismissal was appropriate.'"  Id. (quoting United States v. Foxman, 87 F.3d 1220, 1224 n.4 (11th Cir. 1996)).

Simmons "must demonstrate *actual* prejudice and not merely the real possibility of prejudice inherent in any extended delay."  United States v. Heard, No. 1:12–cr–40 (WLS), 2013 WL 1966299, at *3 (M.D. Ga. May 10, 2013) (citation and internal marks omitted).  Simmons asserts that the lapse of time will have caused the memories of parties and witnesses to be diminished, thereby prejudicing his ability to adequately defend himself.  [Doc. 20 at 2].  He also asserts that it will be difficult for him to access individuals who might otherwise have been able to aid in his defense.  [Id.].  Simmons adds that he will have "difficulty in investigating claims referenced in incident reports over seven [] years old," as well as "contacting and investigating the numerous witnesses who had motives to inculpate him."  [Doc. 29 at 2-3].

Simmons "asserts a general claim that the passage of time dimmed the witnesses' recall.  This sort of speculative assertion does not meet the actual prejudice standard."  Stoner v. Graddick, 751 F.2d 1535, 1546 (11th Cir. 1985) (per curiam) (citations omitted).  "Faded memories occasioned by preindictment delay do not alone satisfy the actual prejudice requirement."  United States v. Corbin, 734 F.2d 643, 648 (11th Cir. 1984) (citations omitted).  Moreover, Simmons' assertions that he will have trouble locating witnesses and investigating the claims

6

against him appears to be based entirely on speculation, and "[t]he mere possibility of prejudice . . . is not sufficient to establish a due process violation, and the[se] general claims of prejudice . . . are insufficient to satisfy [Simmons'] 'exceedingly high' burden of showing actual prejudice resulting from the delay." United States v. Jones, No. CR406-38, 2006 WL 1653762, at *2 (S.D. Ga. June 7, 2006), adopted at *1.  "The general unavailability of witnesses or loss of memory occasioned by the passage of time does not constitute proof of substantial prejudice," and "'[s]peculative allegations, such as [a] general allegation of loss of witnesses and failure of memories, are insufficient to demonstrate the actual prejudice required[.]'"  United States v. Warren, 772 F.2d 827, 836 (11th Cir. 1985) (quoting United States v. Radue, 707 F.2d 493, 495 (11th Cir. 1983) (per curiam)). Thus, the Court finds that the alleged prejudice in this case fails to "rise to constitutional proportions [necessary] to support dismissal."  United States v. Keel, 254 F. App'x 759, 760 (11th Cir. 2007) (per curiam) (unpublished) (internal marks omitted) (quoting United States v. Benson, 846 F.2d 1338, 1342 (11th Cir. 1988)).

Furthermore, "substantial prejudice from delay, standing alone, does not violate due process."  Williams, 2012 WL 5845004, at *2 (alteration, citation, and internal marks omitted).  That is, "[e]ven if [Simmons could] make the necessary showing of prejudice from the delay, [t]he delay must also be the product of a

deliberate act by the government designed to gain a tactical advantage," and "[m]any delays in obtaining an indictment would not be tactical– a word which [the Eleventh Circuit has interpreted as] inherently includ[ing] the concept of intentionally maneuvering for an advantage at trial." Id. (third alteration in original) (citations and internal marks omitted). "[W]here the record shows no reason for the delay (or where delay is due to simple negligence), no due process violation exists." Id. (alterations in original) (citations and internal marks omitted).

Simmons asserts that the government deliberately delayed bringing the instant indictment to gain a tactical advantage by entering into an immunity agreement with his "alleged co-conspirators and other putative witnesses." [Doc. 20 at 2-3]. He claims that the government intentionally built cases against doctors and other individuals first, "and vigorously pursued those cases, any of which Simmons seemingly could have been logically joined given his intimate connection with each of those individuals." [Doc. 29 at 4-5]. Simmons "believes this was for the apparent purpose of prosecuting the big players first, and extracting evidence and possible cooperation from those individuals to more effectively bring claims against the less well-connected such as Simmons[.]" [Id. at 7]. Thus, Simmons contends that "the Court should require further explanation from [the] government" by holding an evidentiary hearing. [Id. at 8].

8

The government responds that Simmons is not entitled to an evidentiary hearing on his due process claim, [Doc. 26 at 6], citing United States v. Farias, 836 F.3d 1315, 1325 (11th Cir. 2016), in which the court found that the defendant "was not entitled to an evidentiary hearing on his due[ ]process claim because he failed to set forth any specific allegations in support of it," id. (citations omitted). Simmons attempts to distinguish this case, arguing that, unlike in Farias, "Simmons has made strong threshold showings of prejudice and tactical advantage[.]" [Doc. 29 at 9]. However, Simmons has failed to identify any evidence showing that the government deliberately delayed seeking an indictment, and his accusations find no support in the record. Although Simmons claims that the government delayed bringing the indictment in an effort to first procure an immunity agreement with others involved in the drug trafficking conspiracy, Simmons identifies no evidence in support of this, and the government has asserted that no such immunity agreement exists. See [Doc. 26 at 4]. Accordingly, the Court finds the record in this case to be analogous to that in Farias, as the government contends.

Simmons points to the dates on which the government gathered evidence against him to support his argument, noting that "[v]irtually all of the documents and reports submitted to [him] in discovery, including witness and alleged co-conspirator interviews, doctor evaluations, [Drug Enforcement Administration

("DEA")] surveillance reports, and warrant information are dated over the period 2011-13," with the sole exception being a report from an interview of Simmons in July 2015.[6]   [Doc. 29 at 4].   He argues that the government delayed his indictment for three years "without any need for apparent investigation (as evidenced by there being no discovery on this case provided for events or incidents after 2015)." [Id. at 6-7].   However, "[t]he government's inaction in bringing the case is insufficient, standing alone, to establish that the government's actions were motivated by an attempt to gain a tactical advantage."   United States v. Butler, 792 F.2d 1528, 1534 (11th Cir. 1986).   "Furthermore, the [g]overnment does not have the burden of coming forward with a reason for the delay," United States v. Pompano Helicopters, Inc., No. 08-60279-CR, 2009 WL 1456745, at *4 (S.D. Fla. May 22, 2009), adopted at *1 (citation omitted), and Simmons "fails to identify facts that would tend to prove that the government acted in bad faith or made a deliberate decision to gain a tactical advantage over him that led to the delay," Ramirez, 491 F. App'x at 70.

Simmons has not demonstrated that "the government deliberately sought a tactical advantage by delaying the indictment," but instead has simply shown, at most, that "the delay–combined with [some] prejudice to him . . . gave the

---

[6] Simmons has moved to suppress statements made at this interview, which is discussed hereinafter.   See [Doc. 21].

government a tactical advantage"; however, "simply gaining a tactical advantage is not enough."   Jones, 592 F. App'x at 922 (citation omitted).   Indeed, even if Simmons' "assertion that the delay has given the [g]overnment a tactical advantage" is true, it "does not satisfy [his] duty to show that the [g]overnment deliberately delayed the indictment to gain a tactical advantage." United States v. Rivera, No. CR209–14, 2009 WL 2390847, at *2 (S.D. Ga. July 9, 2009), adopted by 2009 WL 2422211, at *1 (S.D. Ga. Aug. 4, 2009); see also United States v. Lamb, 214 F. App'x 908, 912 (11th Cir. 2007) (per curiam) (unpublished).   In sum, Simmons' "claim of any [g]overnment intent to obtain a tactical advantage is speculation," Ramirez, 491 F. App'x at 70 (internal marks omitted), and it is therefore **RECOMMENDED** that Simmons' motion to dismiss the indictment due to inexcusable pre-indictment delay, [Doc. 20], be **DENIED**.

**B.**     **Motion to Suppress Statements, [Doc. 21]**

Simmons contends that the statements he made to DEA agents on July 8, 2015, were obtained in violation of his Miranda[7] rights.   [Docs. 21 & 52].   He claims that, although he was presented with and signed a Miranda waiver on this date, the waiver was insufficient because he was not orally advised of his rights and because "it does not appear he was given the opportunity to understand his

---

[7] See Miranda v. Arizona, 384 U.S. 436 (1966).

Miranda rights or properly deliberate upon them." [Doc. 21 at 1-2]. Simmons also argues that his statements were not voluntarily made because they "were given with a hope of benefit of being released from jail," and he "had reason to believe that providing a statement to the federal authorities would help facilitate his release, and the interrogating agents encouraged this perception." [Id. at 2]. The government responds that the Miranda warnings given to Simmons were legally sufficient, and that his statements were knowing and voluntary. [Doc. 53 at 8-13]. The Court will address each of these arguments in turn.

### 1.    Statement of Facts

In July 2015, Simmons was on probation with the Alcovy Judicial Circuit, and one of the conditions of his probation was a Fourth Amendment waiver, which permitted law enforcement to search his residence without first obtaining a warrant. (Tr. at 5). On July 2, 2015, probation officers and DEA task force officers ("TFOs") searched Simmons home pursuant to this Fourth Amendment waiver. (Tr. at 5-6). During the search, TFO William Manning ("TFO Manning") and Special Agent Daman Grimwade ("Agent Grimwade") spoke with Simmons in his garage.   (Tr. at 3, 9, 57, 60).   During this conversation, Simmons was not handcuffed, TFO Manning was in plainclothes with his gun holstered and covered by his clothes, and Agent Grimwade was wearing a police vest with his gun

holstered.   (Tr. at 9, 14-15, 62-63).   They discussed drug trafficking and the possibility of Simmons working as an informant for the DEA.   (Id.).

During this discussion, other officers discovered that a truck found in Simmons' backyard had been stolen.   (Tr. at 9-10).   Anticipating that Simmons would soon be arrested by county officers,[8] (Tr. at 10), TFO Manning read Simmons his Miranda rights from a standard DEA card, (Tr. at 11), which included the following warnings: "[y]ou have the right to remain silent"; "[a]nything you say can be used against you in court"; "[y]ou have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning"; and "[i]f you cannot afford a lawyer, one will be appointed for you before any questioning if you wish," (Gov. Ex. 2).   TFO Manning read this to Simmons in its entirety and then asked Simmons if he understood his rights and if he was willing to answer some questions.   (Tr. at 10-14).   Simmons confirmed that he understood his rights and continued to speak with TFO Manning.   (Tr. at 14).   At no time did Simmons invoke his right to remain silent or request an attorney.   (Id.).   Simmons continued talking about cooperating with the DEA and working as a confidential informant.   (Tr. at 16).   This conversation lasted approximately thirty minutes.   (Id.).

---

[8] Simmons was, in fact, arrested later that day by Newton County law enforcement officers.   (Tr. at 16, 65).

On July 7, 2015, Simmons' wife called TFO Manning and reported that Simmons was in the Newton County jail and wanted to speak with him.[9] (Tr. at 17). TFO Manning and Agent Grimwade interviewed Simmons on July 8, 2015, in a Criminal Investigative Division interview room connected to the jail. (Tr. at 17, 19, 65; Gov. Ex. 4). Simmons was handcuffed during this interview. (Tr. at 18, 65; Gov. Ex. 4). At the beginning of the interview, TFO Manning asked Simmons whether he could read and write in English, and after Simmons confirmed that he could, TFO Manning gave Simmons an Advice of Rights form.[10] (Tr. at 19-20; Gov. Ex. 4 at 0:30-0:44); see also (Gov. Ex. 3). Simmons read the form before initialing in the space next to each of his rights, checking a box confirming that he "read . . . this advice of rights and [he] underst[ood] what [his] rights [were]," and that he was "willing to freely and voluntarily answer questions without a lawyer present," and signing at the bottom. (Gov. Ex. 3; Gov. Ex. 4 at 0:44-1:35). Simmons never told the officers that he wanted to remain silent or that he would like to speak with an attorney. (Tr. at 67; Gov. Ex. 4).

---

[9] Simmons was in jail on state charges stemming from the search of his house on July 2, 2015. (Tr. at 18-19).

[10] The waiver form presented to Simmons on July 8, 2015, contained the same warnings that were read to him by TFO Manning on July 2, 2015. See (Gov. Exs. 2 & 3).

After Simmons signed the waiver form, TFO Manning initiated the conversation by asking, "So what's the deal?" and adding, "we kind of put the ball in your court here." (Gov. Ex. 4 at 1:48-1:56). Simmons again expressed to the officers his willingness to work with them, stating that he would "do whatever it takes." (Gov. Ex. 4 at 1:56-2:10). Approximately two and a half minutes into the interview, TFO Manning began asking Simmons questions, frequently prompting Simmons to clarify his statements or provide additional information throughout the remainder of the interview. (Tr. at 39-40; Gov. Ex. 4).

Simmons repeatedly told the officers that he wanted to work for them as a confidential informant. (Tr. at 27; Gov. Ex. 4). Simmons said that he was "just keeping it real" with them, to which TFO Manning responded, "I appreciate that 'cause . . . this is kind of a test you know honestly because we've got your records and all that." (Gov. Ex. 4 at 14:20-14:50). After Simmons again told the officers that he was willing to work for them, TFO Manning asked Simmons for consent to search his phone, "just to get that out of the way," warning "I'm not trying to make a better case on you . . . I'm just trying . . . to get some other people from what we're talking about. That's all it is." (Gov. Ex. 4 at 38:55-41:45). TFO Manning did not tell Simmons that he was a target of a drug trafficking investigation, (Tr. at 28), but he did mention that the DEA agents had been hearing

his name since 2011 and that "everybody's throwing [his] name out there," (Gov. Ex. 4 at 5:20-5:50).

TFO Manning also told Simmons that he "met with the U.S. Attorney and told him about your situation," and TFO Manning explained that he might be interested in using Simmons as a witness in other cases.  (Tr. at 29; Gov. Ex. 4 at 42:35-46:13).  They also discussed the possibility of setting up recorded phone calls between Simmons and individuals the DEA was investigating.  (Gov. Ex. 4 at 47:20-49:00).  Toward the end of the interview, Simmons asked the officers if they could find some way to have him work for them, and TFO Manning explained that he would have to talk to probation and see if they could get him out of jail, and if they were able to, he would set up another meeting with Simmons where they would go over more details.  (Gov. Ex. 4 at 1:03:20-1:04:00, 1:07:42-1:08:20).  This interview lasted approximately one hour and nine minutes.  (Tr. at 23; Gov. Ex. 4). TFO Manning and Agent Grimwade never made any promises about using Simmons as an informant or making him a deal to reduce his jail time or term of probation.  (Tr. at 29-30, 32, 34, 43-44, 68; Gov. Ex. 4).  Simmons made certain incriminating statements during this interview that he moves to suppress, [Doc. 21], and the government opposes his motion, [Doc. 53].

16

2.     **Legal Analysis**

a.     <u>*Miranda*</u> *Violation Claim*

The ruling in <u>Miranda</u> requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation.  <u>See</u> <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994). Interrogation for <u>Miranda</u> purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  <u>United States v. Gomez</u>, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)). "Statements made in violation of *Miranda* are not admissible at trial."  <u>United States v. Barry</u>, 479 F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).

The parties' post-hearing submissions briefly dispute whether Simmons was subjected to a custodial interrogation on July 8, 2015, and, therefore, whether <u>Miranda</u> warnings were required.  Simmons asserts that he "was in custody for Miranda purposes, although he purportedly initiated the conversation first" because "[t]he agents escalated the conversation" and "failed to convey or signal to [him] that [he] was free to leave the area or stop talking at any time."  [Doc. 52 at 4 (citation omitted)].  The government asserts that "a case could be made that

the conversation on July 8 was not custodial interrogation" because "an interaction between a suspect and a law enforcement officer constitutes [an] interrogation for *Miranda* purposes if it involves questioning initiated by law enforcement officers after the person has been taken into custody," but "[t]he questioning on July 8 was initiated by [Simmons]."  [Doc. 53 at 8-9 n.5 (emphasis, citation, and internal marks omitted)].

A defendant is in custody under Miranda when there has been a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).  However, "[a]n interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation."  United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (quoting United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); see also United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam) (citation omitted) (quoting Minnesota v. Murphy, 465 U.S. 420, 431 (1984)) ("'[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'")  Instead, whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in

18

his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." <u>Barry</u>, 479 F. App'x at 299 (quoting <u>Brown</u>, 441 F.3d at 1347). This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." <u>Brown</u>, 441 F.3d at 1347 (citation and internal marks omitted). Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he . . . was not at liberty to terminate the interrogation and leave.'" <u>Matcovich</u>, 522 F. App'x at 851 (quoting <u>Howes v. Fields</u>, 565 U.S. 499, 509 (2012)). "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." <u>United States v. Street</u>, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal marks omitted) (quoting <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996)). The Court must "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" <u>Barry</u>, 479 F. App'x at 299 (quoting <u>Street</u>, 472 F.3d at 1309). Other factors include "the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and 'the

release of the interviewee at the end of the questioning[.]'"   Matcovich, 522 F.

App'x at 851 (quoting Howes, 132 S. Ct. at 1189).

The July 8, 2015, interview was initiated by Simmons, whose wife called

TFO Manning the day before on Simmons' behalf to request a meeting.  (Tr. at 17).

The officers met Simmons at the Newton County jail where he was in state custody

on unrelated charges.  (Id.).  Their discussion took place in an interview room

attached to the jail.  (Tr. at 17, 65).  Simmons was handcuffed during the entire

interview.  (Tr. at 18, 65-66; Gov. Ex. 4).  TFO Manning gave Simmons a Miranda

waiver form, which Simmons signed.  (Tr. at 19-20, 66; Gov. Ex. 3; Gov. Ex. 4 at

0:30-0:44).  The officers allowed Simmons to begin the conversation, and then

proceeded to prompt him with questions throughout the remainder of their

discussion.  (Tr. at 39-40; Gov. Ex. 4).  The officers did not brandish weapons or

touch Simmons at any point, and the officers maintained a polite and

conversational tone.  (Gov. Ex. 4).  Simmons' demeanor was "[v]ery casual, [and]

very talkative."  (Tr. at 68).  The interview lasted a little over an hour.  (Gov. Ex.

4).

Under the totality of the circumstances, the Court is not convinced that

Simmons was subjected to a custodial interrogation for purposes of Miranda.  The

Eleventh Circuit has previously held that "[t]he term interrogation does not

include instances, such as this, in which the defendant initiated the conversation."

United States v. Bachynsky, 415 F. App'x 167, 176 (11th Cir. 2011) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted); see also United States v. Barner, 572 F.3d 1239, 1245 (11th Cir. 2009) (citations and internal marks omitted) (finding that although the defendant "was in jail on another charge at the time, a form of custody that would generally require the administration of the *Miranda* warnings, incarceration does not *ipso facto* render an interrogation custodial" and "where an incarcerated defendant initiated the police inquiry . . . and the interview took place, not in a jail cell, but under circumstances which suggested that the defendant was free to terminate the conversation," there was no need for the defendant to be read his Miranda warnings).  Although Simmons was physically restrained during the interview, see Matcovich, 522 F. App'x at 851, and was asked questions that were reasonably likely to provoke incriminating responses, see Gomez, 927 F.2d at 1538, there is nothing in the record to suggest that Simmons, who initiated the interview, could not have terminated the conversation or asked to leave the interview room at any time if he chose to do so.

Even assuming that Simmons was subjected to a custodial interrogation for Miranda purposes on July 8, 2015, the Court finds that he was provided with legally sufficient Miranda warnings prior to making any statements.  Simmons asserts that the warnings presented on the waiver form were deficient because

they failed to "advise [him] that he could ask for a lawyer during questioning or stop answering questions at any time."  [Doc. 52 at 5].  The government asserts that the warnings contained all legal requirements.  [Doc. 53 at 8-11].

> Miranda articulated the required elements of the warnings as follows:
>
> [Defendant] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 479.  "'[T]he 'rigidity' of Miranda [does not] exten[d] to the precise formulation of the warnings given a criminal defendant' and [] 'no talismanic incantation [is] required to satisfy its strictures.'"  Street, 472 F.3d at 1311 (second, third, and fifth alterations in original) (quoting California v. Prysock, 453 U.S. 355, 358 (1981)).  Simmons was presented with a waiver form on July 8, 2015, which stated, "[y]ou have the right to remain silent"; "[a]nything you say can be used against you in court"; "[y]ou have the right to talk to a lawyer for advice before we ask you any questions"; "[y]ou have a right to have a lawyer with you during the questioning"; "[i]f you cannot afford a lawyer, one will be appointed for you before any questioning if you wish."  (Gov. Ex. 3).

Although Simmons contends that he was not properly apprised of his right to an attorney, "nothing in the warnings given [] suggested any limitation on the right to the presence of [] counsel[.]"  Prysock, 453 U.S. at 360-61.  The warning

22

contained statements that communicated to Simmons his right to talk to a lawyer before any questioning, have a lawyer with him during questioning, and be appointed counsel if he could not afford to hire a lawyer.  (Gov. Ex. 3).  "In combination, [these] warnings reasonably conveyed [Simmons'] right to have an attorney present, not only at the outset of [the] interrogation, but at all times." Florida v. Powell, 559 U.S. 50, 62 (2010) (footnote omitted).  Finally, although Simmons contends that the officers were required to inform him that he could end the questioning at any time, this warning is not required under Miranda.  See United States v. Sanchez, Case No. 05-20596 CR COOKE, 2006 WL 8442973, at * 2 (S.D. Fla. April 13, 2006), adopted by 2006 WL 8442972, at *1 (S.D. Fla. April 27, 2006) (citation omitted) (noting that the "defendant need not be warned of [the] right to stop questioning").  Accordingly, the Court finds that the warnings provided to Simmons satisfied the Miranda requirements.

Simmons also argues that he was not properly apprised of his Miranda rights because "the agents did not read [his] rights to him, but merely had him review and sign the form."  [Doc. 52 at 5 (citation omitted)].  The government responds, "all that Miranda requires is that the appropriate information be conveyed to a defendant," and "[t] he exact verbiage or manner in which it is done is irrelevant."  [Doc. 53 at 11].  The Court agrees.  "There is no requirement as to the precise manner in which [officers] communicate the required warnings to one

suspected of a crime," rather "[t]he requirement is that the [officers] fully advise such a person of his rights, and [Simmons] made no showing that he did not read or understand the written warnings which were presented to him." Bell v. United States, 382 F.2d 985, 987 (9th Cir. 1967); see also United States v. Coleman, 524 F.2d 593, 594 (10th Cir. 1975) (per curiam); United States v. Alexander, 441 F.2d 403, 404 (3d Cir. 1971) (per curiam) ("[T]he [] agents were not obliged to advise him orally of his Miranda rights in contradistinction to so advising him in writing.").  Indeed, courts in this Circuit have previously denied motions to suppress statements where the defendant was apprised of his Miranda rights in writing, instead of orally.  See, e.g., United States v. Teague, No. 2:10-CR-006-RWS-SSC, 2010 WL 6529640, at *21 (N.D. Ga. Nov. 12, 2010), adopted by 2011 WL 1497876, at *1 (N.D. Ga. April 19, 2011) (finding the defendant's statements were not taken in violation of Miranda where the officer "confirm[ed] that [the defendant] could read and write in English" and "presented him with an Advice of Rights and Waiver form," which the defendant then read and signed prior to questioning); United States v. Stamps, CR. No. 2:05CR42-F, 2005 WL 6124572, at *2-3 (M.D. Ala. July 20, 2005) (rejecting the defendant's argument that his statements should be suppressed because the "FBI agents did not advise him of his rights prior to the interrogation" after finding that he "was given an 'Advice of Rights' form, which informed [him] of his Miranda rights," before any questioning).  Therefore, Simmons' statements

on July 8, 2015, were not taken in violation of Miranda and are not due to be suppressed on this ground.[11]

        **b.**    ***Voluntariness Claim***

Although Simmons' statements were not taken in violation of Miranda, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Simmons] were voluntary in order to admit them at trial." United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)).  Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.   United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'"  United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-

---

[11] The government also argues that, even if the Miranda warnings provided to Simmons on July 8, 2015, were insufficient, his statements are admissible because he was given sufficient Miranda warnings on July 2.  (Tr. at 7); see also [Doc. 53 at 8-11].   However, because the Court finds that the July 8 warnings satisfied Miranda, the Court need not address the sufficiency of the July 2 warnings.

RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police."  Id. (citations omitted).

The focus of the voluntariness inquiry is whether Simmons was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345 (citation omitted).  Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'"  United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession."  United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985),

modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Simmons moves to suppress his statements on the ground that they were involuntary. [Doc. 21 at 2; Doc. 52 at 10-12]. Specifically, Simmons contends that his statements were "predicated entirely on his desire to reduce his jail sentence and[/]or avoid federal prosecution" and that "[TFO] Manning fed on [his] desires through discussing deals and talking about the need to get approvals up the chain to see if something could be done on [his[ behalf[.]" [Doc. 52 at 10 (citation omitted)]. The government responds that Simmons' statements were knowing and voluntary because "[t]he record is clear that law enforcement did not promise that they could get [Simmons] out of jail or that [Simmons] could work as a confidential informant." [Doc. 53 at 12-13].

Although it appears that Simmons was motivated to speak to the officers by his desire to work as a confidential informant in hopes of securing some favorable consideration regarding pending or potential criminal charges, the officers did no more than entertain this possibility and fell far short of ever promising Simmons that they would reach an agreement to this effect. Indeed, TFO Manning

mentioned that he had spoken with the U.S. Attorney about potentially using him as a witness in other related cases, (Tr. at 29; Gov. Ex. 4 at 42:35-46:13), and discussed the possibility of setting up recorded phone calls between Simmons and other suspects connected with the investigation, (Gov. Ex. 4 at 47:20-49:00); however, TFO Manning made it clear that there remained procedural steps that would have to be taken before Simmons could work with them, (Tr. at 30-32; Gov. Ex. 4 at 1:03:20-1:04:00; 1:07:42-1:08:20).  TFO Manning and Agent Grimwade each testified at the evidentiary hearing that Simmons was never made any promises,[12] (Tr. at 29-30, 32, 34, 43-44, 68), and the video recording of the July 8 interview confirms this, (Gov. Ex. 4).  Accordingly, "nothing in the record evidences that anyone made promises to [Simmons], direct or implied, in exchange for his statements."  United States v. Mercer, 541 F.3d 1070, 1075 (11th Cir. 2008) (per curiam) (footnote omitted).

---

[12] Simmons asserts that there are "serious credibility issues" with respect to the testimony of TFO Manning and Agent Grimwade.  [Doc. 52 at 11-12].  He points out that TFO Manning wrote in his report for the July 8 interview that he read the Miranda warning to Simmons, but the video showed that Simmons executed a written waiver instead.  [Id. at 11].  TFO Manning testified about this discrepancy, explaining that he "was mistaken" and "meant to say he was advised of his Miranda rights."  (Tr. at 20).  Simmons also asserts that there are inconsistencies in the officers' testimony that render them unreliable.  [Doc. 52 at 11-12].  However, upon review of the video recording from the July 8 interview, the Court finds the officers' testimony credible as they otherwise accurately described the circumstances of the interview.

Simmons also argues that his statements were not voluntary because TFO Manning misled him as to his purposes behind the questioning.  [Doc. 52 at 11]. Simmons notes that TFO Manning told him, "I'm not trying to make a better case on you," (Tr. at 28-29; Gov. Ex. 4 at 38:55-41:45), "while conceding that he did in fact regard Simmons as a target of the investigation and indeed did know that information provided by Simmons during the interview could be used against Simmons," [Doc. 52 at 6-8, 11 (citation omitted)]; see also (Tr. at 28, 45).  To the extent that TFO Manning deceived Simmons as to his motives during the interview, "[o]ur circuit law rejects a *per se* rule that statements obtained by police deception must be suppressed."  United States v. Farley, 607 F.3d 1294, 1236 (11th Cir. 2010).  "Generally, courts have held statements involuntary because of [the officers'] trickery only when other aggravating circumstances were also present." Id. at 1238 (citation omitted).

In support of his argument for suppressing his statements, Simmons cites United States v. Lall, 607 F.3d 1277 (11th Cir. 2010), in which the defendant's statements were suppressed because the interrogating officer told the defendant prior to questioning that "he was not going to pursue any charges against him," which the court found contradicted the prior warning that anything the defendant said could be used against him and "compel[led] the conclusion that . . . [the defendant] did not truly understand the nature of his right against self-

29

incrimination or the consequences that would result from waiving it."   Id. at 1283 (citation and internal marks omitted).  The government responds that "[t]his same fact pattern or one similar to it does not exist in [Simmons'] case."  [Doc. 53 at 10]. The Court agrees.

TFO Manning told Simmons that he was not trying to build a better case against him at approximately thirty-eight minutes into the interview, after Simmons had already freely spoken to the officers and made several incriminating statements that he now moves to suppress.  Moreover, TFO Manning made this statement long after Simmons had been provided with Miranda warnings, including the warning that anything he said could be used against him, and after TFO Manning informed Simmons that the DEA agents had been hearing his name in connection with this investigation since 2011, indicating that his conduct was encompassed in the investigation.  (Gov. Ex. 3; Gov. Ex. 4 at 0:44-1:35, 5:20-5:50, 38:55-41:45).  Therefore, unlike in Lall where the officer's assurance that he would not pursue charges against the defendant rendered the defendant's Miranda waiver involuntary, 607 F.3d at 1283, TFO Manning did not induce Simmons' inculpatory statements.   "Considering the totality of the circumstances as established by the evidence adduced at the evidentiary hearing, the Court finds that the government has demonstrated by a preponderance of the evidence that [Simmons'] statements were entirely voluntary."  United States v. Lynn, 547 F.

Supp. 2d 1307, 1311 (S.D. Ga. 2008), adopted at 1308 (citation omitted).  Thus, the

statements Simmons made on July 8, 2015, are not due to be suppressed, and it is

**RECOMMENDED** that Simmons' motion to suppress, [Doc. 21], be **DENIED**.[13]

---

[13] In his motion to suppress, Simmons only challenged the statements he made "on or about July 7, 2017, while he was incarcerated at the Newton County jail." [Doc. 21 at 1].  However, in the conclusion of his post-hearing brief, Simmons seeks suppression of "any and all statements [he] purportedly made during each of the referenced July 2015 conversations." [Doc. 52 at 13].  As the government correctly notes, Simmons "is inappropriately attempting to seek relief beyond his initial motion to suppress in which he only sought to suppress his statements from July 8, 2015." [Doc. 53 at 7 n. 4].  Indeed, when the government offered testimony at the evidentiary hearing about his statements to law enforcement on July 2, Simmons' counsel objected, asserting that he was only seeking to suppress the statements made on July 8.  (Tr. at 6-7).  In response to defense counsel's objection, the government explained:

> It is the government's contention that [] Simmons was Mirandized by DEA agents on July 2nd, and then he reinitiated contact with the DEA and was then Mirandized a second time, and the government holds it's important for the Court to understand that he was Mirandized once by TFO Manning, and then re-Mirandized later on, and . . . these matters do in fact relate.

(Tr. at 7).  Simmons had ample opportunity before the evidentiary hearing to move to suppress both July 2015 statements, as the government confirmed at the pretrial conference on January 22, 2019, that Simmons had received all statements he made to law enforcement, but he did not move to suppress the July 2 statements.  See [Doc. 25].  And, Simmons did not move to amend his motion to suppress based on the testimony presented at the evidentiary hearing, either at the hearing or in a post-hearing motion. See [Docs. 48 & 49].  Moreover, he offers only conclusory arguments for suppression of the July 2 statements in his post-hearing brief.  See [Doc. 52].  In any event, even if Simmons' motion to suppress had encompassed the July 2 statements, he has not demonstrated any basis for suppressing the statements he made on that date as the Court finds, based on the totality of the circumstances from the testimony presented at the evidentiary hearing, that

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Simmons' motion to dismiss, [Doc. 20], and motion to suppress, [Doc. 21], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 8th day of October, 2019.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

Simmons was not in custody when he voluntarily spoke with federal law enforcement agents in his garage while a search of his home was being conducted by his probation officer and other law enforcement agents, see United States v. Stinson, 659 F. App'x 534, 536 (11th Cir. 2016) (per curiam) (unpublished), and he was provided Miranda warnings when it became apparent that he would be arrested on state charges based on the stolen truck found during the search, and after a knowing, voluntary, and intelligent waiver of those rights, he continued to voluntarily speak to the agents, see United States v. Johnson, 379 F. App'x 964, 968-69 (11th Cir. 2010) (per curiam) (unpublished); (Tr. at 5-16).